**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| LARRY WADE GRAMMER | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2:17-CV-1815-KOB |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

On May 13, 2014, at the age of 19, the claimant, Larry Wade Grammer, protectively applied for child's insurance benefits and supplemental security income based on disability. (R.76, 88). In both applications, the claimant alleged disability commencing on May 9, 2007 (at the age of 12), because of migraines, epilepsy, and bipolar disorder. (R. 34). The Commissioner denied the initially on July 17, 2014. The claimant then filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on October 3, 2016. (R. 32).

In a decision dated February 7, 2017, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and, was, therefore ineligible for social security benefits. (R. 25). On October 4, 2017, the Appeals Council denied the claimant's request for review. (R. 1). Consequently, the ALJ decision became the final decision of the Commissioner of the Social Security Administration. The claimant has exhausted his administrative remedies, and this court

has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this Court reverses and remands the decision of the Commissioner to the ALJ for reconsideration.

## II. ISSUES PRESENTED

Whether the ALJ properly considered indigent circumstances as an excuse for failure to follow prescribed medical treatment.[1]

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.1987).

"No . . . presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the ALJ's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that

---

[1] Although the claimant raised various issues on appeal including (1) whether the ALJ properly determined that the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments; (2) whether the ALJ gave proper weight to the treating physician's medical opinion; and (3) whether substantial evidence supports the ALJ's assessment of the claimant's residual functional capacity, the court will not address these issues and will reverse and remand on the ALJ's failure to consider indigent circumstances alone.

would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d).

Whether the claimant meets a Listing and is qualified for Social Security disability benefits is a

question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence,

or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206,

1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the

significance of certain facts, the court has no power to reverse that finding as long as substantial

evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the

[ALJ]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to

those parts of the record that support the decision of the ALJ, but also must view the record in its

entirety and take account of evidence that detracts from the evidence relied on by the ALJ.

*Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

A claimant's refusal to follow prescribed medical treatment without good cause will

preclude a finding of disability. 20 C.F.R. § 404.1530(b). However, poverty may excuse failure

to follow prescribed medical treatment. *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir.

2003). When the ALJ does not significantly rely on the claimant's noncompliance, the ALJ's

failure to consider evidence regarding the claimant's inability to afford his prescribed treatment

does not constitute reversible error. *Id.*; *Bellew v. Acting Comm'r of Social Sec.*, 605 F. App'x

917, 921 (11th Cir. 2015). But when the ALJ significantly relies on a claimant's noncompliance

as grounds to deny disability benefits and the record indicates that the claimant could not afford

prescribed medical treatment, the ALJ must make a determination regarding the claimant's

ability to afford treatment. *Ellison*, 355 F.3d at 1275.

# V. FACTS

The claimant alleges an onset date of May 9, 2007 at the age of twelve years old. (R. 76, 88). The claimant stated that his seizures began as a child after he was struck in the head with a rock. (R. 447). The claimant applied for CIB and SSSI benefits at the age of nineteen, and he was twenty-two years old at the time of the ALJ's final decision in 2017 in 2017. (R. 34). The claimant has a seventh grade education and no past relevant work (R. 39-41, 17, 42). The claimant alleges disability based on epilepsy, migraine headaches, and bipolar disorder. (R. 34).

*Impairments*

On November 22, 2013, the claimant visited Dr. Jan Mathisen at the Alabama Department of Rehabilitation Services: Children's Rehabilitation Center ("the Rehabilitation Center"). Dr. Mathisen noted that the claimant was having a seizure approximately every 4-6 weeks; these seizures were "not significantly severe at this point," but that the claimant was not driving because of his "ongoing events"; and the claimant's family was concerned that he had been staying up late and sleeping throughout the day. At the time of this visit, the claimant was taking Zonisamide at 100mg, 4 at bedtime; Depakote 500 mg, 3 at bedtime; Lamotrigine 100 mg at bedtime; and Diastat 10mg for breakthrough seizures. Dr. Mathisen continued these medications but increased the Lamotrigine to 50mg in the morning and 100mg at night for two weeks and prescribed 100mg of Trazodone to help regulate the claimant's sleep pattern. Aside from these issues and adjustments, Dr. Mathisen recorded the claimant's general health as "quite good." (R. 290).

On Sunday, April 20, 2014, the claimant suffered a seizure that lasted for 3-4 minutes, but he did not visit a doctor. However, the claimant informed Dr. Mathisen about the recent seizure during the claimant's appointment on April 25, 2014. Additionally, during this

appointment, Dr. Mathisen noted that the claimant continued to have breakthrough seizures, and as a result was unable to find a job. Dr. Mathisen also stated that the claimant was not compliant with his medications and that some of the seizures were because of the claimant's non-compliance; however, Dr. Mathisen also stated that the claimant had a history of chronic epilepsy and that the claimant's seizures persisted even when the claimant was compliant with his medication. Finally, Dr. Mathisen noted that the claimant was still having issues sleeping and prescribed 100mg of Trazodone. (R. 289).

Less than a month later, on May 6, 2014, the claimant visited Dr. Diana Paulk at Garrett Counseling & Consulting ("GCC") complaining of recent suicidal thoughts. The claimant stated that he was depressed and angry. The claimant stated that he attempted suicide on two occasions. The claimant explained that he once attempted to shoot himself, but the gun did not fire; the second time, the claimant planned to hang himself but "got tired of thinking about it." The claimant also stated that he drank sometimes and would smoke more if he could afford the habit. Dr. Paulk discussed the impact that alcohol can have on depression and compiled a list detailing the claimant's problems, which included abandonment, anger, depression, disability, employment, impulsivity, legal problems, memory loss, mood swings, relationships, and self-esteem. Finally, the claimant told his therapist that he would like to find employment, and that he had attempted to use the Opportunity Center Program with little luck. (R. 354-356).

Shortly after the claimant's first counseling session, he visited the Jackson Medical Center on May 15, 2014 with a chief complaint of seizures. The record indicates that the claimant was unconsciousness, confused upon waking up, and shaking all over. The claimant also suffered an injury from biting his tongue during the seizure. Jacksonville Medical Center treated with Tylenol and Depakote and discharged the claimant. (R. 294-296).

After recovering from the previous seizure, the claimant had his second session at GCC on May 22, 2014. The claimant appeared neat and showed no signs of hostility or anger during the session. The claimant stated that he completed his homework from the last session, and that he had used some of the suggested methods to calm himself down when necessary. The counselor and claimant scheduled the claimant's next appointment for May 28, 2014. (R. 352).

The claimant did not attend his appointment scheduled for May 28th. As a result, on June 4, 2014, Ms. Nicole Burgess, an intern from GCC spoke with the claimant's grandmother about the claimant's missed appointment. Additionally, the grandmother asked questions about the claimant's insurance payment and stated that she would make sure that the claimant attended his next appointment on June 9, 2014. (R. 349).

On June 6, 2014, the claimant spoke with someone[2] at GCC about the cost of the sessions. That individual at GCC told the claimant about other counseling agencies that have sliding scale payment options; stated that it would continue to offer services to the claimant through its intern, Ms. Burgess; encouraged the claimant to follow up with the local mental health clinic to learn about income based services; and stated that its counselors would help the claimant transition when necessary. (R. 348).

As planned, the claimant met with Ms. Burgess on June 9, 2014.[3] During the appointment, the claimant stated that he was sad because Father's Day was approaching and he would not be able to see his son. The claimant also stated that he did not have any anger issues over the previous week. Outside of these two disclosures, the claimant was unwilling to participate and continuously stated that he did not feel like talking. Finally, the session notes

---

[2] The notes from GCC do not indicate to whom the claimant spoke. (R. 348).

[3] The record notes from GCC state that the events described in this paragraph happened on "5/9/14." The court believes this date is a typographical error. The order of events, the order of the session notes from GCC, the scheduled date for the next session (6/19/14), and the "notes locked" date of 6/10/14 indicate that these events likely took place on 6/9/14 rather than 5/9/14. (*See* R. 347).

indicate that the claimant had lost his health insurance, but that GCC would continue to provide free services until the claimant got an appointment with a free local clinic. (R. 347).

The claimant returned to GCC for another session with Ms. Burgess on June 19, 2014. Ms. Burgess noted that the claimant appeared well-groomed and neat. She also noted that the claimant appeared shy as he stared at the floor and fidgeted his hands during the session. The claimant stated that his visit with his father on Father's Day went well; that he had no anger issues since the last session; but that he did not make attempts to get to know people or make friends because of his anger. Ms. Burgess recommended that the claimant seek anger counseling. (R. 346).

On June 20, 2014, the claimant visited Dr. Anthony Esposito at Anniston Neurology & Headache Management Center. Dr. Esposito diagnosed the claimant as having depression and severe grand mal seizures that occurred approximately every two months. Dr. Esposito reported that the claimant had not experienced any recent seizures, but Dr. Esposito also stated that the claimant "is 100% disabled from a neurological standpoint and unable to obtain any gainful employment." Finally, Dr. Esposito requested that the claimant return to Anniston Neurology in three months. (R. 324-325).

On June 23, 2014, the claimant missed his scheduled appointment at GCC. The claimant stated that his grandmother was sick and asked to reschedule for later in the week. Ms. Burgess rescheduled the appointment for June 27, 2014. The claimant also missed the appointment scheduled for June 27th. The counselor attempted to call the claimant, but no one answered.(R. 345).

One week later, on June 30, 2014, Ms. Burgess spoke with the claimant's grandmother regarding the claimant's missed appointments. The grandmother stated that the claimant missed

the first appointment because he would not get out of bed, and that the claimant missed the second appointment because she was unaware that the appointment had been rescheduled for June 27th. The counselor discussed the importance of attending meetings and stated that the claimant should contact GCC to schedule any future appointments. The counselor also stated that GCC might charge a fee for any additional services. The grandmother responded by saying that she would encourage the claimant to return to counseling once his Medicaid was reestablished. (R. 344).

A few months later, the claimant returned to Anniston Neurology for a follow up on September 19, 2014. Dr. Esposito stated that the claimant had not had any seizures since his last visit in June, and listed the claimant's grand mal seizure diagnosis as "improving." Dr. Esposito also stated that the claimant experienced depression. Additionally, Dr. Esposito reiterated that the claimant "is 100% disabled from a neurological standpoint and unable to obtain any gainful employment." Dr. Esposito also gave the claimant samples of Depakote and stated that the claimant would apply for "PAP as he is unable to work or afford his med[ication]." Finally, Dr. Esposito requested that the claimant return to Anniston Neurology in three months. (R. 331-332).

On January 15, 2015, the claimant returned to Anniston Neurology complaining of migraines. Dr. Esposito stated that the claimant reported that his migraine episodes had increased, occurring approximately one time per week. Dr. Esposito also stated that the claimant had experienced a "decrease in activity level" with various associated symptoms, including "sensitivity to light, visual disturbance, and nausea." Dr. Esposito noted that Imitrex helped the claimant, but the claimant was unable to afford it. Finally, Dr. Esposito stated that the claimant's grand mal seizures were "improving" and "well controlled." (R. 328).

Approximately two weeks later, the claimant returned to Anniston Neurology on January 26, 2015 reiterating his complaints about his migraines. Dr. Esposito stated that the claimant's migraine episodes remained unchanged with migraine episodes occurring approximately once per week. Dr. Esposito recorded the claimant's epilepsy disorder as "improving" and "well controlled," but again stated that the claimant was "100% disabled from a neurological standpoint." Dr. Esposito also gave the claimant Relpax and Imitrex samples. (R. 334-335).

On October 2, 2015, the claimant visited Baptist Medical complaining of a seizure. Dr. Pereira diagnosed the claimant with convulsions. Dr. Pereira performed a physical exam and noted that the claimant appeared "well-developed and well-nourished." The claimant was drowsy, but did not exhibit any signs of distress. The claimant later stated that he was taking Valproic acid 500mg at bedtime – a medication used to treat seizures, migraines, and bipolar disorder – but that he had not taken his dosage for that night. The claimant also stated that he would arrange a follow up with the Kirkland Clinic as he had aged out of seeing his child neurologist. Dr. Pereira discharged the claimant on October 3, 2015. (R. 375-380).

Later that month, on October 23, 2015, the claimant arrived at Shelby Baptist by ambulance with a chief complaint of seizures. (R. 397). Dr. Alexander noted that the claimant was at home alone when he started to seize; the claimant's mother came home and found him actively seizing. The claimant did not remember what he was doing before the seizure started, nor did he remember anything that happened during the seizure. Additionally, Dr. Alexander noted that the claimant took all of his medications on this particular morning before he had the seizure. Finally, Dr. Alexander noted that the claimant was still attempting to find another neurologist. Dr. Alexander diagnosed the claimant with convulsions and discharged the claimant on October 23, 2015. (R. 466-471).

Approximately two weeks later, the claimant returned to Shelby Baptist by ambulance on November 6, 2015. The claimant could not remember if he had had a seizure; the last thing that the claimant remembered was that he was sitting on the porch talking to his aunt. Additionally, Dr. Dueffer noted that the claimant had seen one of the neurologists at Shelby Baptist, but the claimant could not remember the neurologist's name. Dr. Dueffer noted that the seizure caused the claimant's speech to be delayed and slurred, and that the claimant's cognition and memory were impaired. Dr. Dueffer diagnosed the claimant with convulsions and noted that the claimant was not therapeutic on his current medication. Dr. Dueffer switched the claimant to Keppra, instructed the claimant to follow up with Neurologist Dr. Eslami in two days, and discharged the claimant on November 6, 2015. (R. 486-496).

After the claimant's discharge on November 6, he went home to sleep but started having a migraine. The claimant thought that he might have another seizure. As a result, on November 7, 2015, the claimant returned to Shelby Baptist complaining about the migraine. The claimant was also vomiting prior to arriving at the hospital. Dr. Espinel gave the claimant Imitrex and the claimant fell asleep. After the claimant woke up, Dr. Espinel noted that the claimant was no longer nauseated and that the claimant was pain free. Dr. Espinel discharged the claimant later that day. (R. 519).

A few weeks later, the claimant returned to Shelby Baptist on November 24, 2015 for his fourth visit within a span of approximately 30 days. The claimant arrived via ambulance complaining of seizures. (R. 401). The claimant stated that he was talking on the phone when he began screaming uncontrollably and fell to the floor. The claimant was unable to remember who he was speaking with on the phone. Dr. Kline noted that the claimant was on Imitrex as needed

and Keppra 500mg. Dr. Kline diagnosed the claimant with convulsions and discharged the claimant on the same day. (R. 537).

On December 3, 2015, Shelby Baptist admitted the claimant for seizures. Dr. Black noted that the claimant had a history of frequent and uncontrolled grand mal seizures. Dr. Black also stated that the claimant was uninsured and having approximately one seizure per week. As a result, the claimant was relying on frequent visits to the emergency room when he had a seizure. The Neurology Department[4] stated that Depakote had historically controlled the claimant's seizures well and recommended reintroducing this medication to the claimant. The claimant disagreed, stating that he thought Keppra worked best for his condition. The claimant then stated that he would not take any seizure medication. Dr. Black diagnosed the claimant with increasing frequency of seizure activity and discharged the claimant on December 6, 2015 with Depakote and instructions to follow up with Dr. Eslami. (R. 447).

The claimant returned to Shelby Baptist via ambulance complaining of seizures and a dislocated finger on March 22, 2016. Dr. Tubbs diagnosed the claimant with convulsions, as well as a fractured and dislocated right index finger. Dr. Tubbs indicated that the claimant had a history of seizures and depression, and that a flashing cellphone might have caused the current seizure. During the claimant's physical exam, Dr. Tubbs indicated that the claimant appeared "well-nourished," but that the claimant was also in a post-ictal state. Dr. Tubbs discharged the claimant on March 22, 2016. (R.420-424).

*The ALJ Hearing*

The ALJ hearing took place on October 3, 2016. At the hearing, the claimant, his girlfriend Connie Bailey, and vocational expert Katy Tweedy testified. Ms. Bailey testified

---

[4] The record does not give the neurologist's name.

primarily because of the claimant's memory loss issues that he experiences before, during, and after seizures.

The claimant testified that he was currently living with Ms. Bailey and her four children. Before living with Ms. Bailey, he "bounced from place to place" between his father and other family members. Additionally, the claimant stated that he spent three years in the seventh grade and eventually was asked to leave. He attempted to get his GED but was unsuccessful because he could not understand the information. The claimant also stated that he had never had a real job. When he was younger, he worked jobs "under the table" such as putting up fencing when he was fifteen and sometimes cutting grass. (R. 37-42).

Regarding the claimant's epilepsy, he testified that he had his first seizure at the age of twelve. The claimant stated that strobe lights, stress, lack of sleep, alcohol, drugs, migraines and becoming too hot can trigger his seizures; that he typically needs a week to recover from a seizure; that he spends most of his recovery time in bed and sleeping; and that he tries not to move around too much because he can become lightheaded. Additionally, the claimant testified that his most recent seizure occurred a week before the hearing. He was fishing on a camping trip when he got too hot and had the seizure. At the hospital, the medical staff gave the claimant generic Depakote, which he claimed caused him to have two more seizures. (R. 48-49).

Regarding the migraines, the claimant testified that they began when he was a child shortly after his first seizure. He stated that the migraines can last for two to three days. (R. 42-44). Additionally, the claimant testified that he was currently taking some medications, including Depakote, but cannot take generic Depakote because it causes him to have more seizures. Additionally, the claimant testified that in 2014 Dr. Esposito gave the claimant samples of the medication because the claimant's insurance would soon expire and he would no longer be able

to afford his medication. The claimant also stated that he had previously taken Imitrex for his migraines, but that he stopped because he no longer had insurance and was unable to afford the medicine. (R. 40-49).

Regarding the claimant's daily activities, he stated that he usually gets up in the morning and helps fix the children breakfast before school, normally preparing eggs or giving the children crackers and juice. The claimant stated that the two youngest children remain at home because they are too young for school, but he is not allowed to stay at home alone with the children. (R. 44-46). When the oldest children are at school, he and Ms. Bailey spend some days going to doctor's appointments for the two youngest children who are both disabled. After the older children return from school, the claimant typically helps to fix snacks for the children before football and cheer practice. After practice, everyone typically eats dinner and goes to bed. He stated that he does not watch a lot of television or play computer games because the flashing lights can cause him to have seizures. The claimant also does not drive to any of the doctor's appointments or extracurricular activities because he does not have a license. (R. 46-48).

Ms. Bailey stated that the claimant's seizures are random, and she stated that migraines, stress, being too hot or cold, a lack of sleep, and even watching television can cause the claimant to have a seizure. She testified that the claimant once had a seizure in the car after the two rode past a car accident because of the sirens and lights. Ms. Bailey testified that the claimant often has severe migraines that typically last for three to four days and cause the claimant to vomit. She also stated that his migraines sometimes cause him to have seizures, and that those seizures often cause the claimant to stop breathing, bite chunks out of his tongue, and experience atrial fibrillation issues. (R. 58-59, 67-68).

Regarding the claimant's medication, Ms. Bailey stated that the claimant is unable to take the generic brand of Depakote because it causes more seizures. Furthermore, she claimed that doctors tried changing his medication to Keppra, but that medication did not allow the claimant to reach a therapeutic level and he had seizures at least every two weeks. She also testified that she gives the claimant his medicine because he could not remember to take his medicine because of his memory loss. She stated that she gave the claimant his medicine three times a day – more times than prescribed – but he was still having breakthrough seizures. To stop the claimant's breakthrough seizures, Ms. Bailey would normally rectally insert the claimant with Ativan; however, she stated that the claimant was currently out of the Ativan syringes because he could not afford them. According to Ms. Bailey, two syringes cost $722.00. (R. 56-62).

Regarding the claimant's daily activities, Ms. Bailey stated that the claimant slept a lot because of his medications. She stated that she never left him at home alone. The claimant would often go with her to take her children to the doctor and sometimes slept in the car during these appointments. Ms. Bailey also testified that the claimant was learning to cook "basics"; make a sandwich; and help fix juice for the children in the morning. She also testified that the claimant did not watch television much because it could trigger seizures. (R. 62-66).

A vocational expert, Ms. Tweedy, testified concerning the type and availability of jobs that the claimant could perform. The ALJ asked Ms. Tweedy to assume an hypothetical individual with the claimant's age and education who does not have any exertional limitations but cannot climb ladders, ropes or scaffolds; cannot drive; can have no exposure to hazardous moving machinery; cannot be exposed to unprotected heights, open bodies of water such as catfish ponds or swimming pools, or heat sources that one might find in a commercial kitchen setting; can occasionally be exposed to extreme cold and heat, pulmonary irritants, and migraine

triggers, such as fumes, odors, dusts, gases and chemicals; can understand, remember, and carry out simple instructions for two hours with normal mid-morning, lunch, and mid-afternoon breaks throughout an eight-hour day; can have occasional interaction with the public; and cannot experience frequent changes in the work setting. Ms. Tweedy responded that the hypothetical individual could perform work as a hand packager, with 1,900 jobs in Alabama and 173,800 jobs nationally; a plastic product laborer, with 2,000 jobs in Alabama and 106,000 jobs nationally; and a store laborer, with 1,300 jobs in Alabama and 90,700 jobs nationally. (R. 69-70).

Next, the ALJ asked Ms. Tweedy to explain the customary tolerance for absenteeism in these jobs. Ms. Tweedy responded that an individual may miss one day per month and that anything in excess of one day per month might mean that an individual would be unable to maintain competitive employment. Then, the ALJ asked Ms. Tweedy how much an employer would tolerate an employee being off task during the day. Ms. Tweedy responded that an individual may be off task 10% of the workday, but that anything in excess of 10% might mean that an individual would be unable maintain competitive employment.

Finally, the ALJ asked Ms. Tweedy whether any special accommodations might be available for employees that needed to miss more than one day of work per month or be off task more than 10% of the day. Ms. Tweedy stated that no special accommodations would be available for either scenario. After this questioning, the claimant's attorney expressed concerns that the absentee limit and off-task behavior might eliminate the jobs suggested by the vocational expert, necessarily making a finding of "disabled" appropriate. The ALJ stated that if the claimant's absenteeism exceeded one day per month, then the claimant would "clearly" be disabled because no jobs would be available for him. (R. 70-73).

On February 7, 2017, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant was born on September 11, 1994 and had not attained age 22 as of May 9, 2007, the alleged onset date. Next, the ALJ found that the claimant had not engaged in substantial gainful activity since May 9, 2007. In fact, the ALJ found that the claimant had no past relevant work history; therefore, transferability of job skills was not an issue. (R. 28, 34).

Next, the ALJ found that the claimant had the following severe impairments: epilepsy, migraine headaches, bipolar disorder, and alcohol use disorder. Further, the ALJ found that the impairments constituted more than a slight abnormality and had more than a minimal effect on the claimant's ability to perform basic activities for a continuous period of twelve months.

The ALJ also noted that the claimant had a history of atrial fibrillation; however, the ALJ stated that the claimant underwent a successfully surgery in October of 2016 and no longer suffered from these issues. Therefore, he stated that the impairment could not reasonably be expected to produce more than minimal, if any, work-related limitations and is non-severe. (R. 28-29).

Next, the ALJ found that the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ considered the claimant's epilepsy under the criteria of 11.02 of Appendix 1, Epilepsy, but determined that the claimant's medical records did not establish that the claimant had seizures at the frequency needed to meet the listing. (R. 28-29).

Next, the ALJ considered the claimant's bipolar disorder impairment under section 12.00 of Appendix 1. The ALJ determined that the claimant had only moderate limitation in all four areas of mental functioning (understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself). The ALJ noted that the claimant could follow simple instructions when could read them, prepared his own meals, independently handled his own personal care, and watched television. Even though the ALJ acknowledged that the claimant had issues paying attention, could not handle stress well, and needed reminders to take his medication, the ALJ determined that the claimant's mental impairments did not cause at least one extreme limitation or two marked limitations. As a result, the ALJ found that the paragraph B criteria were not met. (R. 28-29).

Next, the ALJ considered whether the paragraph C criteria were met. The ALJ stated that the evidence established that the claimant had only marginal adjustment – a minimal capacity to adapt to changes in his environment, but no evidence suggested that change has a significant effect on the claimant's ability to function. (R. 29-30).

Next, the ALJ determined that the claimant has the residual functional capacity to perform a full range of work at all exertional levels, but with the following non-exertional limitations: cannot climb ladders, ropes, or scaffolds; cannot drive commercial vehicles; can have no exposure to hazardous moving machinery, unprotected heights, open bodies of water, or heat sources that one might find in a commercial kitchen setting; can have occasional exposure to extreme cold and heat, pulmonary irritants, and migraine triggers such as fumes, odors, dusts, gases and chemicals; can understand, remember, and carry out simple instructions for two hours with normal breaks throughout an eight-hour day; can have occasional interaction with the public; and cannot experience frequent changes in the work setting. (R. 30).

In making this finding, the ALJ stated that he considered the claimant's symptoms and the objective medical evidence. The ALJ summarized the claimant's and Ms. Bailey's testimony and stated:

> A review of the evidence shows a history of treatment for these impairments. However, the claimant's and Ms. Bailey's statements concerning the intensity, persistence, and limiting effects of these impairments are not consistent with the objective medical evidence. They both alleged debilitating symptomatology and limitations associated with his alleged impartments, yet the evidence as a whole fails to confirm a disabling level of functional limitations caused by any physical or mental impairment. While it is reasonable the claimant may experience some symptoms of his seizures that would cause some limitations, the objective medical evidence does not support a complete inability to work. (R. 31).

Additionally, when considering Ms. Bailey's testimony, the ALJ stated that "she has a clear economic interest in his disability claim as he lives with her and her four children, two of whom are receiving disability. She also is unemployed." Further considering the objective medical evidence, the ALJ stated that the claimant's medical history documented a history of seizures, but that "the evidence as a whole fails to confirm a disabling level of functional limitations caused by any physical or mental impairment," and that "the objective medical evidence does not support a complete inability to work." The ALJ ended his consideration by noting that the claimant's seizures were a result of the claimant's failure to comply with taking his medication. (R. 31).

Next, the ALJ determined that Dr. Esposito's opinion was entitled to "little weight." The ALJ noted that, at the claimant's last two visits with Dr. Esposito in 2015, the claimant did not report any seizure activity, and that Dr. Esposito noted that the claimant's seizures were well-controlled. The ALJ stated that, despite the fact that the claimant reported no seizure activity between September 19, 2014 and May 15, 2015, Dr. Esposito stated that the claimant was "100% disabled from a neurological standpoint and unable to obtain any gainful employment." The ALJ

stated that the decision regarding disability is a decision reserved for the Commissioner based on all evidence. (R. 32).

In examining the medical evidence, the ALJ noted that, since the claimant's last visit with Dr. Esposito, the claimant "use[d] the emergency room for a neurology clinic," repeatedly failed to follow up with a neurologist, and continued to be non-compliant in taking medication. Additionally, regarding the claimant's bipolar disorder, the ALJ noted that the claimant was non-compliant by missing appointments and that the claimant did not receive counseling from June of 2014 until August of 2016. (R. 33).

Finally, given the claimant's age, education, and residual function capacity, the ALJ determined based on the vocational expert's testimony, that jobs exist in the national economy that the claimant could perform. The ALJ determined, based on the testimony at the hearing and the medical evidence, that the claimant was not disabled under the Social Security Act. (R. 35-36).

## VI. DISCUSSION

The claimant argues that the ALJ did not properly consider indigent circumstances; this court agrees. Poverty excuses a failure to comply with medical treatment. *Dawkins v. Bowen*, 848 F.2d 1211, 1213-14 (11th Cir. 1988). When the ALJ significantly relies on noncompliance as the ground for the denial of disability benefits and the record contains evidence showing that the claimant is financially unable to comply with prescribed treatment, the ALJ is required to determine whether the claimant was able to afford the prescribed treatment. *Ellison*, 355 F.3d at 1275. To properly deny benefits based on a failure to follow to prescribed treatment, the ALJ must find that had the claimant followed the prescribed treatment, the claimant's ability to work

would have been restored. *Dawkins,* 848 F.2d at 1211, 1213. This finding must be supported by substantial evidence. *Id.*

In *Dawkins*, the claimant applied for supplemental security income benefits based on various medical problems. The medical reports indicated that the claimant was having difficulty complying with her medical treatments. At the hearing before the ALJ, the claimant testified that her lack of compliance with her medication was due to her inability to afford the prescription. The ALJ ultimately denied the claimant benefits. The Eleventh Circuit stated that the ALJ "relied primarily if not exclusively" on the claimant's noncompliance with her medical treatment and failed to consider whether poverty was a good excuse. *Dawkins*, 848 F.2d at 1212-13. Because the ALJ's finding that the claimant was not disabled was "inextricably tied to the finding on noncompliance," the court found that the ALJ erred by failing to consider the claimant's inability to afford her medication. *Id*. at 1214.

Regarding the current claimant, the first step is to determine whether the ALJ relied on the claimant's noncompliance. In the ALJ's decision, he found:

> A review of the evidence shows a history of treatment for these impairments. However, the claimant's and Ms. Bailey's statements concerning the intensity, persistence, and limiting effects of these impairments are not consistent with the objective medical evidence. They both alleged debilitating symptomatology and limitations associated with his alleged impartments, yet the evidence as a whole fails to confirm a disabling level of functional limitations caused by any physical or mental impairment. While it is reasonable the claimant may experience some symptoms of his seizures that would cause some limitations, the objective medical evidence does not support a complete inability to work. (R. 31).

In the above, the ALJ does not state exactly why or how the objective evidence fails to support the claimant's claims; however, after this determination, the ALJ focuses on the claimant's noncompliance with his medication. Specifically, the ALJ notes that the claimant admitted noncompliance with his medication and then determines that the claimant's seizures were a

result of a non-therapeutic level of medication. (R.31). The ALJ went on to note five occasions between October of 2015 and January 2016 where the claimant visited the emergency room for a seizure and was not compliant with his medication. (R. 31). Regarding the claimant's bipolar disorder, the ALJ pointed out that the claimant missed numerous sessions, and that the claimant did not attend counseling at any agency from June of 2014 to August of 2016. (R. 31-32). The ALJ did not provide reasons other than the claimant's noncompliance for the finding of "not disabled;" nor did the ALJ explain that the decision was based on other facts. As a result, the ALJ's finding that the claimant was not disabled was "inextricably tied to the finding of noncompliance." *See Dawkins*, 848 F.2d at 1214.

Even though the ALJ relied on the claimant's noncompliance, to find reversible error, the record must contain evidence showing that the claimant is financially unable to comply with the prescribed treatment. *Ellison*, 355 F.3d at 1275. Regarding claimant's migraines and seizures, both the claimant and physicians expressed that the claimant could not afford his medication. For example, on January 15, 2015, Dr. Esposito noted that Imitrex helped the claimant with his migraines, but that the claimant could not afford it. (R. 338). In fact, the next time the claimant visited Dr. Esposito on January 26, Dr. Esposito gave the claimant Relpax and Imitrex samples, presumably because the claimant could not afford the medicine. (R. 334-335). On December 3, 2015, a different physician – Dr. Black – stated that the claimant was uninsured and was relying on frequent visits to the emergency room when he had seizures. (R. 447). Additionally, both the claimant and Ms. Bailey testified that the claimant was unable to afford his medication, and that the claimant was relying on samples. (R. 40, 61-62).

Regarding the claimant's bipolar disorder, the notes from GCC indicate that the claimant and his grandmother were increasingly concerned about the claimant's Medicaid running out.

GCC offered some free assistance, but on June 30, 2014, GCC told the claimant that it might have to charge the claimant a fee for future services. Apparently, as a result, the claimant stopped attending counseling until 2016 because of his financial circumstances. Overall, the record indicates numerous occasions where the claimant's finances were a concern regarding his treatment for migraines, seizures, and bipolar disorder. As a result, the record supports the determination that the claimant was financially unable to comply with his medical treatments.

Even though the ALJ significantly relied on noncompliance and the record contains evidence suggesting the claimant's inability to afford his medicine, the ALJ did not make a determination regarding whether the claimant was able to afford the prescribed treatment. *See Ellison*, 355 F.3d at 1275. The ALJ did not mention the instances cited above where the claimant, Ms. Bailey, physicians, and counselors expressed concern about the claimant's inability to afford his treatments. Nor did the ALJ find that, if the claimant had followed the prescribed treatment, the claimant's ability to work would have been restored. *See Dawkins*, 848 F.2d at 1211, 1213. In fact, the ALJ did not address the breakthrough seizures that the claimant experienced while he was compliant with his medication. (R. 289). Ultimately, the ALJ's failure to apply the correct legal standard is a reversible error.

*Other Concerns*

The court is concerned about the ALJ's finding that the national economy has jobs for the claimant. The vocational expert testified regarding the jobs available for the claimant that no special accommodations would be available for an individual who missed one day per month, or who was off task 10% of the workday. After this questioning, the claimant's attorney expressed concerns that the absentee limit and off-task behavior might eliminate the jobs suggested by the vocational expert. The ALJ stated that if the claimant's absenteeism exceeded one day per

month, then the claimant would "clearly" be disabled because no jobs would be available for him. The claimant and Ms. Bailey's testimony indicate that the claimant needs multiple days to recover after having a seizure, and that the claimant's migraines can last numerous days. If the claimant continues to have multiple seizures per month, how the claimant would not exceed the absenteeism or off-task limit is unclear.

## VII. CONCLUSION

For the reasons stated above, this court concludes that the decision of the Commission is due to be REVERSED and REMANDED.

The court will enter a separate order in accordance with the Memorandum Opinion.

DONE and ORDERED this 21st day of February, 2019.

_Karon O. Bowdre_

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE